John K. WALKER, Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant.

Civ. A. No. 86–339–JLL.

United States District Court, D. Delaware.

May 14, 1987.

Stephen F. Dryden of Steinberg & Girsh, P.C., Philadelphia, Pa., for plaintiff.

F. Alton Tybout of Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I.  INTRODUCTION

Since this case was filed, the Court has been speedily transported to a point where it must determine whether an insurance company which issues a policy under the provisions of the Delaware Automobile Insurance Plan has an obligation to offer an insured the opportunity to purchase or reject uninsured motorist coverage, even if the insured rejected such coverage when applying for insurance.  This case is clearly one of first impression in Delaware and the Court has not found any cases from other states confronting the same issue under a similar set of facts.

This case was originally filed in the Superior Court for New Castle County.  The defendant, State Farm Mutual Automobile Insurance Company ("State Farm"), successfully petitioned for removal of the case to this Court.  (*See* Docket Item ["D.I."] 1.)  This Court has diversity jurisdiction under the provisions of 28 U.S.C. § 1332, because the plaintiff, John K. Walker ("Walker"), is a citizen of Delaware, State Farm is an Illinois corporation with its principal place of business in Illinois, and the amount in controversy exceeds $10,000.

Soon after the case was transferred, the parties filed cross-motions for summary judgment.  (D.I. 10, 14.)  The resolution of these motions is the primary subject of this opinion.  For the reasons discussed below, the Court holds that State Farm did not have an obligation to offer uninsured motorist coverage to Walker or obtain his

written rejection of such coverage, after State Farm had been assigned to issue a policy to Walker pursuant to the terms of the Delaware Automobile Insurance Plan. Therefore, the Court will grant State Farm's motion for summary judgment and deny the plaintiff's motion.

After briefing for the summary judgment motions was completed, Walker filed a Motion for Certification to the Delaware Supreme Court, after Judge Stiftel issued an opinion in *Hicks v. State Farm Mut. Auto. Ins. Co.*, C.A. No. 85C–JL–39 (Del. Super. March 30, 1987) [Available on WESTLAW, DE–CS database]. Walker claims that *Hicks* contradicts the holding of *Burton v. Coleman*, C.A. No. 82C–JA–116 (Del.Super. July 12, 1984), on an issue central to the resolution of the summary judgment motions. Because the Court can decide the summary judgment motions without the need to resolve the possible contradiction between *Hicks* and *Burton*, the motion to certify will be denied.

## II. BACKGROUND

The facts of this case and the issues presented by the parties' motions for summary judgment and certification can be understood best after one is aware of how the Delaware Automobile Insurance Plan operates. Therefore, an explanation of the Plan will precede the specific facts of this case.

The Delaware financial responsibility statute requires every owner of a motor vehicle registered in Delaware to insure the vehicle for at least prescribed minimum amounts of bodily injury liability, property damage liability, and personal injury protection insurance. *See* 21 *Del.C.* §§ 2118(a), 2902.[1] The Legislature, through the mandatory insurance requirement, clearly intended to ensure that drivers have a means to cover at least some of the losses resulting from accidents they cause. Failure to abide by the mandatory insurance requirement can lead to a fine, imprisonment, and/or a suspension of driving privileges. 21 *Del.C.* § 2118(r).

The mandatory insurance requirement presents a problem for drivers unable to obtain coverage directly from an insurance company. To provide for this situation, the Legislature adopted 21 *Del.C.* § 2905. Section 2905(a) provides:

Any applicant for registration who in good faith has applied to 2 insurance companies for a policy of insurance or surety bond under this chapter but who is unable to procure such insurance from said companies shall thereupon notify the Insurance Commissioner, in writing, and the Insurance Commissioner upon receipt of said notice shall thereupon assign said application to 1 of the insurance companies handling such insurance and doing business in this State. Such insurance company shall promptly issue a policy at the rate then prevailing for such policies, adding an automatic surcharge of 10 percent over and above such rate then in force and effect, for similar policies of insurance.[2]

The Insurance Commissioner was authorized to promulgate regulations necessary to apportion the applications equitably, establish reasonable rates for such insurance, and ensure the smooth operation of an assigned risk plan. 18 *Del.C.* § 2527. The Commissioner used this authority to establish the Delaware Automobile Insurance Plan.[3] Section 2 of the Plan Regulations

---

1. Self-insured motorists are excepted from the § 2118(a) requirement.

2. Section 2905(a) also provides for a twenty-five percent surcharge for drivers who need to use the assigned risk plan because they have been convicted of driving at an excessive rate of speed or in a reckless manner where an injury to person or property results therefrom and a fifty percent surcharge for drivers using the plan because they were convicted of driving while intoxicated, failing to stop and report when involved in an accident, or homicide or assault arising out of the operation of a motor vehicle. Although Walker's application for insurance indicates that he had been in an accident, it is unclear whether Walker was subjected to either of these surcharges. Whether or not he was subjected to them does not affect the outcome of this case.

3. The Delaware Automobile Insurance Plan shall be referred to in the remainder of this opinion either as the assigned risk plan, the Plan, or the Plan Regulations.

requires "[e]very insurer holding a Delaware Certificate of Authority valid for the line of vehicle insurance shall be required to become a subscriber to the Delaware Automobile Insurance Plan, whether or not direct business is written." [4] Walker received his policy from State Farm through the assigned risk plan.

Before setting forth the particular facts of this case, an additional section of the Insurance Code should be examined, because the legal issues presented by this case center on the application of 18 *Del.C.* § 3902 to policies issued through the assigned risk plan. Section 3902 provides in part:

> (a) No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle shall be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this State unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or hit-and-run vehicles for bodily injury, sickness, disease, including death, or personal property damage resulting from the ownership, maintenance or use of such uninsured or hit-and-run motor vehicle.
>
> (1) No such coverage shall be required in or supplemental to a policy when rejected in writing, on a form furnished by the insurer or group of affiliated insurers describing the coverage being rejected, by an insured named therein.... The coverage herein required may be referred to as uninsured vehicle coverage.
>
> (2) The amount of coverage to be so provided shall not be less than the minimum limits for bodily injury and property damage liability insurance provided for under the motorist financial responsibility laws of this State....

. . . .

> (b) Every insurer shall offer to the insured the option to purchase additional coverage for personal injury or death up to a limit of $100,000 per person and $300,000 per accident or $300,000 single limit, but not to exceed the limit of bodily injury set forth in the basic policy. Such additional insurance shall include underinsured bodily injury liability coverage.

The statutory purpose behind section 3902 is clear. Whereas the 21 *Del.C.* § 2118 requirement of mandatory insurance is intended to protect persons injured by a driver, section 3902 is intended to give every driver the opportunity to consider whether to protect against persons who fail to comply with the mandatory insurance requirement or who have inadequate coverage. *O'Hanlon v. Hartford Accident & Indem. Co.*, 439 F.Supp. 377, 383 (D.Del.1977); *Abramowicz v. State Farm Mut. Auto. & Ins. Co.*, 369 A.2d 691, 694 (Del.Super.1977).

In the action before this Court, Walker seeks to reform the policy he obtained from State Farm through the assigned risk plan. When Walker applied for the insurance, he rejected uninsured motorist coverage. On October 28, 1984, during the time the State Farm policy was in force, Walker suffered a physical injury caused by a motor vehicle. The driver of the vehicle was covered by a $25,000 maximum liability insurance policy. This liability coverage was offered to and accepted by Walker, with State Farm's consent, in settlement of his claim against the driver. (D.I. 1 [Superior Court Complaint] at ¶¶ 12, 13.)

Walker now claims that the damages from his injury exceed the $25,000 paid on the driver's liability policy. Under the section 3902(b)(2) definition of underinsured motorist,[5] Walker would be entitled to recover the amount of his damages in excess of $25,000, up to the limit of any uninsured motorist coverage he might have pur-

---

4. All references to the Plan Regulations are to the regulations effective January 1, 1984.

5. Section 3902(b)(2) provides:
   An underinsured motor vehicle is one which there may be bodily injury liability coverage in effect, but the limits of bodily injury liability coverage under all bonds and insurance policies applicable at the time of the accident total less than the limits provided by the uninsured motorist coverage.

chased.[6] Despite the fact that he rejected uninsured motorist coverage on the assigned risk plan application, Walker contends his policy with State Farm should be reformed to provide him with $100,000 per person and $300,000 per occurrence of uninsured motorist coverage because State Farm allegedly failed to perform the duties imposed on it by section 3902.

Walker applied for his assigned risk plan policy on March 27, 1984. The application was received by Herbert Snyder ("Snyder"), an insurance salesman for Metropolitan Life Insurance Company. Snyder was the "producer of record" for Walker's policy. Any licensed agent or broker, either resident or nonresident, with current authority to write motor vehicle insurance could have been the producer of record for Walker's policy. *See* Plan Regulations § 11(a)(9)(A). The parties agree that Snyder was not acting as State Farm's agent when he accepted Walker's assigned risk plan application. (D.I. 7 at ¶¶ 5–7; D.I. 11 at 4, 5.)

Snyder received Walker's insurance application on the form prescribed by the Plan.[7] *See* Plan Regulations § 11(a). Walker took advantage of the option to have his coverage become effective immediately. *Id.* at § 12(b). The date and time of the application were listed on the application and Walker paid the first installment of his premium. From this point Walker had what the Plan terms "Evidence of Insurance" which provides up to thirty days of coverage. *Id.* at § 12(c). This is a sufficient amount of time for the producer to forward the application to the Plan office,

for the Plan office to assign the risk, and for the assigned insurer to issue a policy within the fifteen-day limit established by the Plan Regulations. *See id.* at §§ 12(b), 13(a), (b).

Walker purchased the statutorily required minimum amounts of coverage for bodily injury liability ($15,000 per person/$30,000 per occurrence), property damage liability ($10,000), and personal injury protection ($10,000 per person/$20,000 per occurrence). (D.I. 11A at A–6.) The annual premiums for this coverage are set by the Plan and totaled $729.00. According to Snyder, Walker purchased the minimum amounts because he stated that he could not afford a higher level of coverage. (D.I. 15 at 5.) Snyder claims he explained the general concept behind uninsured motorist protection before Walker checked the "Reject UM Coverage" box on the application. *Id.* at 6.

## III. ANALYSIS

Both Walker and State Farm have moved for summary judgment. This Court can properly grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must draw all inferences from the record in a light most favorable to the non-moving party, *Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748

---

**6.** Even though the driver who injured Walker was "underinsured" instead of "uninsured," this opinion will for simplicity's sake only refer to uninsured motorist coverage when discussing § 3902, even though § 3902(b) clearly states that the coverage applies to accidents caused by either an uninsured or underinsured motorist.

**7.** Walker's application was taken on Form AIP 7220 which had been used since July 1975. At the time Snyder received Walker's application, Form AIP 7240P had recently been introduced in January 1984. Although the new form could have been used by Snyder, producers had until April 1, 1984, to start using the new form. *See* Notice from Delaware Automobile Insurance

Plan to All Delaware Automobile Insurance Plan Manualholders (January 27, 1984).

With regards to uninsured motorist coverage, the form used by Snyder to take Walker's application read as follows:

Uninsured Motorist ...

I ☐ Accept  ☐ Reject UM Coverage

The new form contained this slight difference:

Uninsured Motorist .....................................

I ☐ Accept  ☐ Reject Uninsured Motorist Coverage.

Given the substantial similarity between the forms, the Court's resolution of the issues before it would be the same regardless of which form was used.

(1977), but "Rule 56(c) mandates entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Co. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Walker makes two arguments in support of his motion for summary judgment. First, he claims that checking a box on an assigned risk plan application is not, as a matter of law, an effective waiver of uninsured motorist coverage. Walker's second argument is related to his first argument. He contends that because State Farm failed to offer him uninsured motorist coverage in the manner required by section 3902, as a matter of law State Farm should be deemed to have made a continuing offer of coverage, even after the date of the accident.

Naturally, State Farm takes issue with Walker's arguments and it provides four arguments of its own in support of its motion for summary judgment. First, State Farm contends that Walker knowingly and emphatically rejected uninsured motorist coverage which eliminates the possibility that State Farm has a continuing obligation to offer insurance. Second, State Farm asserts that even if Walker did not make an effective rejection of uninsured motorist coverage, his policy can only be reformed to his bodily injury liability coverage limits which are $15,000 per person and $30,000 per occurrence. State Farm's third argument follows from its second argument. State Farm contends that even if Walker's policy was reformed to provide $15,000 per person uninsured motorist coverage, he will not be able to recover from State Farm because the amount of coverage is less than the $25,000 Walker received in settlement of his claim against the driver. Finally, State Farm posits that section 3902 does not apply to the assigned risk plan.

As noted above, this case is one of first impression. The Delaware courts have decided a number of cases interpreting section 3902, but all of these cases involved an insured who purchased coverage directly from an insurer or its agent. *See, e.g., Ritter v. Amica Mut. Ins. Co.,* 633 F.Supp. 362 (D.Del.1986); *Douty v. Nationwide Mut. Ins. Co.,* C.A. No. 85–027–CMW (D.Del. April 10, 1986) [Available on WEST-LAW, DCT database]; *Hall v. Allstate Ins. Co.,* C.A. No. 79C–DE–56 (Del.Super. January 11, 1985); *Burton v. Coleman,* C.A. No. 82C–JA–116 (Del.Super. July 12, 1984). The Delaware state courts have not had an opportunity to consider the interrelation between the assigned risk plan and § 3902. Because this Court has diversity jurisdiction over this action, the Court essentially sits as a state court and it must predict how the issues presented would be resolved by the Delaware Supreme Court. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir. 1981).

As mentioned above, after briefing was completed on the cross-motions for summary judgment, Judge Stiftel issued his decision in *Hicks v. State Farm Mut. Ins. Co.,* C.A. No. 85C–JL–39 (Del.Super. March 30, 1987). This prompted Walker to file a Motion for Certification pursuant to Delaware Supreme Court Rule 41, because *Hicks* allegedly contradicts the holding of other Superior Court cases which have said the bodily injury liability coverage limits of a policy can be increased in a section 3902 reformation case, which in turn allows the uninsured motorist coverage limits to be increased to the same level. In support of the motion, Walker submits that if *Hicks* is determined to be the law in Delaware, then he is foreclosed from recovering in this action. The Court agrees that if *Hicks* is law in Delaware, then State Farm's second and third arguments would be correct and Walker could not prevail in this action. The Court does not need to grant Walker's motion for certification because summary judgment can be granted in favor of State Farm on the basis of its fourth argument. Nevertheless, the Court shall set forth the parameters of the supposed conflict between the Superior Court cases before proceeding to resolve the summary judgment question, because the eventual resolution of this conflict by the Delaware Supreme

Court will have a significant impact on future section 3902 reformation cases.

### A. Motion for Certification

█ If State Farm's second argument, that even if Walker did not effectively reject uninsured motorist coverage his policy can only be reformed to provide $15,000 of coverage is undeniably correct, then the cross-motions for summary judgment could easily be resolved in State Farm's favor. The amount of coverage provided by State Farm would be less than the $25,000 settlement received by Walker, which means that Walker would not be "underinsured" as that term is defined by section 3902(b)(2). Therefore, Walker would be precluded from recovering from State Farm.

Walker disagrees with a major legal premise behind State Farm's second argument which is that in a section 3902 reformation case, the uninsured motorist coverage can only be increased to the level of the actual bodily injury liability coverage purchased by the insurer. Walker claims that the bodily injury liability coverage can and should be reformed to $100,000 per person and $300,000 per occurrence, which would then allow the uninsured motorist coverage to be raised to those same limits. Although not explicitly stated in his briefs, Walker implies that if he had been adequately informed of the interrelation between uninsured motorist coverage and bodily injury liability limits, he would have raised his bodily injury liability limits to $100,000/$300,000.

State Farm's second argument undoubtedly is supported by Judge Stiftel's recent holding in *Hicks, supra.* Walker contends that *Hicks* is an aberration which contradicts the holdings in previous cases. Walker cites *Burton v. Coleman,* C.A. No. 82C–JA–116 (Del.Super. July 12, 1984), in which Judge Taylor denied cross-motions for summary judgment because neither side had presented evidence to support nor refute the claim that the plaintiff would have purchased the highest available limits of bodily injury liability coverage and uninsured motorist coverage, if he had been adequately informed of the relationship between them.

Judge Taylor cited *Bargelski v. Nationwide Mutual Ins. Co.,* C.A. No. 81C–DE–77 (Del.Super. April 26, 1983), as support for his holding. *Bargelski* involved a plaintiff who had bodily injury liability coverage in an amount exactly equal to the liability limit of the tortfeasor's policy. Nationwide contended in its motion for summary judgment that even if the plaintiff's policy was reformed to provide uninsured motorist coverage up to the limits of the plaintiff's bodily injury liability coverage, he would not be entitled to benefits in light of the tortfeasor's own policy liability limits. Judge Martin denied Nationwide's motion because by requesting the reformation of the bodily injury liability and uninsured motorist coverages, the plaintiff stated a claim upon which relief can be granted.

If the question of whether the bodily injury liability coverage limit can be increased beyond the coverage actually purchased by the insured was the only issue involved in this case, the Court would have to resolve the apparent dispute or grant Walker's motion for certification. Because the Court can resolve the cross-motions for summary judgment in State Farm's favor by determining that section 3902 does not apply to the assigned risk plan, the Court will neither proceed needlessly to resolve the apparent incongruities between *Hicks, Burton,* and *Bargelski,* nor certify a question to the Delaware Supreme Court which is not absolutely essential to the resolution of the motions. Therefore, Walker's motion to certify will be denied.

### B. Summary Judgment

█ State Farm's motion for summary judgment will be granted because the Court holds that section 3902 does not impose a duty on an insurer issuing a policy through the assigned risk plan to obtain the insured's written rejection of uninsured motorist coverage when such coverage has been rejected on the assigned risk plan application. Therefore, the insurer does not have a continuing obligation to offer this coverage to the insured. The essential difference in the relationship between insurer and insured, when the policy is issued

through the assigned risk plan instead of through conventional channels, serves as the primary reason for the Court's holding.

The Delaware courts have held that section 3902 imposes some very specific duties on an insurer in a conventional insured/insurer relationship. *O'Hanlon v. Hartford Accident & Indem. Co.*, 439 F.Supp. 377 (D.Del.1977), was the first case to interpret section 3902. In *O'Hanlon* Judge Stapleton explained that one of the functions of section 3902 is to "[require] liability insurers to offer an insured the opportunity to protect himself or herself from the risks posed by an uninsured driver to the same degree the insured protects others through liability insurance." *Id.* at 383. Judge Stapleton went on to state that "[t]he purpose of Section 3902 was to promote and encourage uninsured motorist coverage." *Id.* at 388. Consistent with that purpose, Judge Stapleton held that under section 3902 an insurer has a duty "to come forward and inform the insured of the limits of uninsured motorist coverage available." *Id.*

The *O'Hanlon* interpretation of section 3902 was accepted by the Delaware Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Arms*, 477 A.2d 1060 (Del.Supr.1984). *Arms* established the Delaware rule of law that "if an insurer fails to offer additional uninsured motorist coverage pursuant to section 3902(b), then the insurer is deemed to have made a continuing offer of additional coverage to the insured." This continuing offer remains open even after the accident has occurred. *Id.* The only way to avoid this continuing offer is to fulfill the section 3902 requirement of obtaining the insured's written rejection of uninsured motorist coverage.

Both *O'Hanlon* and *Arms* involved situations where the insured purchased coverage directly from the insurer. The insurer was in a position to make the statutorily required offer of uninsured motorist coverage. The same is not true in this case. Under the Plan Regulations, State Farm essentially was insuring Walker from the time he completed the application, even though the application still had to go to the Plan office for assignment. *See* Plan Reg-

ulations § 12(c). To hold that State Farm has a duty imposed by section 3902 to obtain Walker's written rejection of uninsured motorist protection would lead to situations certainly not intended by the Legislature when it passed section 3902. Under Walker's view of section 3902 and its relation to the assigned risk plan, if an accident occurred between the time of application and the time the insurer was assigned the risk, the insurer would still have to offer uninsured motorist coverage to the insured, even though the insurer was unaware of the insured's existence at the time of the accident and never had an opportunity to obtain a written rejection from the insured.

Walker refers to the following finding by the Delaware Supreme Court in *Arms:*

Insurance policies typically are not negotiated agreements. Consumers are presented with a complex form agreement on a take-it-or-leave-it basis. The industry has its own obscure terminology which, despite efforts toward plain language policies, is nevertheless difficult for the typical consumer to understand fully. In these respects, insurance agreements are classic examples of contracts of adhesion.

477 A.2d at 1065 (citations omitted). Walker contends that he was confronted with one of these take-it-or-leave-it situations when he simply had to check a box on a form, which provided an insufficient explanation of how uninsured motorist coverage relates to bodily injury liability coverage, in order to reject uninsured motorist coverage. The problem with Walker's argument is that the assigned risk plan application was not prepared or presented by State Farm. Unlike the insurers in *O'Hanlon* and *Arms*, State Farm did not voluntarily enter into an insurance relationship with Walker evidenced by a contract of adhesion prepared by State Farm. Walker may have had to fill out the form prescribed by the Plan, but he did have the option of selecting a variety of levels of coverage. State Farm, on the other hand, was compelled by statute and the Plan Regulations to issue a policy to Walker within fifteen days of receipt of the application. Plan Regulations § 13(a). If the policy involved

in this case was a contract of adhesion, then it was as much or even more a contract of adhesion imposed by statute on State Farm, rather than upon Walker. The fact that both parties had to use a form prescribed by the Plan and pay or receive a premium established by the Plan further reinforces the Court's conclusion that *Arms* and *O'Hanlon* are distinguishable on their facts from the present action.

Section 10(c) of the Plan Regulations requires the following:

Protection Against Uninsured/Underinsured Motorists shall be afforded under every automobile liability policy issued at limits of liability in force under this Plan subject to a deductible of $250 for property damage arising out of any one accident. The limits of liability under this coverage shall not exceed the limits of liability purchased under Bodily Injury Liability.

Clearly, this section reflects the basic requirement of section 3902 and promotes the purpose behind section 3902. As discussed, such coverage would normally be offered by the insurer. Although the Plan Regulations are not specific on this point, this Court predicts the Delaware Supreme Court would hold that section 10(c) requires that uninsured motorist coverage be offered through the Plan and that the risk has to be covered by the company which is assigned the risk, but that the offer is made through the application for assigned risk insurance instead of by the insurer after the application has been assigned and coverage is already in force. This conclusion is supported by the fact that the insurer is required to issue a policy within fifteen working days of the time it receives the application from the Plan office. Plan Regulations § 13(a). It is difficult to imagine that the insurer could receive the application, contact the insured to make the additional offer of uninsured motorist coverage or to obtain a written rejection of coverage, process the application, and issue the policy within this fifteen-day limit.

Walker strenuously argues in his briefs that the rejection of uninsured motorist coverage by checking a box on the form is inadequate in view of *O'Hanlon, Arms,* and related cases. (D.I. 11 at 8–12.) The Court refuses to speculate on whether the rejection would be considered effective, because even if checking a box on a form would not normally constitute a valid rejection of coverage in a typical commercial setting, the Court has already established that State Farm did not have any duty under the assigned risk statute and Plan Regulations to obtain a further rejection of coverage. If either the Insurance Commissioner or the Legislature desires to require assigned risk plan insurers such as State Farm to make a further offer of uninsured motorist coverage or to obtain a further written rejection of coverage, then this requirement should be clearly reflected by the assigned risk statute or regulations.

## IV. CONCLUSION

For the reasons discussed above, State Farm's motion for summary judgment will be granted and Walker's motion for summary judgment will be denied. An order will be entered in conformity with this Opinion.